AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | | |
|---|---|---|
| United States of America<br>v.<br>Rebecca Pina,<br>*Defendant(s)* | ) ) ) ) ) ) ) | Case No. 3-19 71442 |

**FILED**
SEP -4 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

JCS

~~UNDER SEAL~~

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  October 18, 2017  in the county of  San Francisco  in the
Northern  District of  California  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:
Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form: ___/s/___
WILLIAM FRENTZEN
Assistant United States Attorney

_____
*Complainant's signature*
Janette Spring, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  9/3/19

_____
*Judge's signature*

City and state:  San Francisco, California      Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

### A. SYNOPSIS

1. I submit this affidavit in support of a criminal Complaint for Rebecca PINA ("PINA").

2. There is probable cause to believe PINA engaged in a scheme to commit Medicare fraud by agreeing to introduce home health marketers to physicians willing to accept kickbacks in exchange for home health and/or hospice patient referrals in violation of 42 United States Code, Section 1320a-7b(b)(2)(A

3. As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE").

4. An identified co-conspirator informed the investigation that PINA was an individual willing to engage in a kickback for patient referral scheme.

5. During the course of the investigation, UCE held multiple in-person audio and video recorded conversations with PINA in 2017. During their conversations, PINA and a co-conspirator, Mervina DEGUZMAN ("DEGUZMAN"), discussed a scheme in which PINA and DEGUZMAN would

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

1

introduce CW-1 and UCE to individuals willing to refer patients for home health and/or hospice services in exchange for kickbacks.

6.  In accordance with the agreement, DEGUZMAN later introduced CW-1 and UCE to two physicians in San Jose, CA, Dr. Tam NGUYEN ("NGUYEN") and Dr. Zheng ZHANG ("ZHANG"). Both NGUYEN and ZHANG accepted kickbacks from UCE in exchange for patient referrals.

### B. BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION

7.  Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care. [2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

2

8.      An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments

9.      Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

10.     In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial

introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

11.     In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care. [5] During the course of the UCO, there was

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C. AGENT QUALIFICATIONS

12. I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

13. In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b.

14. This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D. COMPLAINANT

15. Rebecca PINA is a 38 year-old marketer whose last known employment was with Brookside Skilled Nursing Hospital in San Mateo, CA.

### E. STATUTES VIOLATED

16. **Title 42 United States Code, Section 1320a-7b(b)(2)(A)**, in relevant part, makes it a crime to knowingly and willfully offer any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

## II. PROBABLE CAUSE

### A. DEGUZMAN INTRODUCES PINA TO CW-1 AND UCE

17. In January 2017, CW-1 identified Mervina DEGUZMAN ("DEGUZMAN"), the Director of Nursing for Canyon Springs Post-Acute ("Canyon Springs") in San Jose, CA, as a participant in a kickback for patient referral scheme.

18. Because of her position with Canyon Springs, DEGUZMAN maintained numerous relationships with physicians in the San Jose, CA area. DEGUZMAN used her connections to engage in a kickback scheme, directing patients to certain facilities in exchange for cash.

19. On September 28, 2017, DEGUZMAN introduced PINA to CW-1 and UCE during a breakfast meeting in San Mateo, CA. During the meeting, PINA and DEGUZMAN discussed their participation in the scheme and which co-conspirators could be brought "on board". Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| DEGUZMAN: | TAM [NGUYEN] and ZHANG are good. Like, you don't have to market anywhere else. |
| CW-1: | Hook us up- we- if we have business, we'll hire the staffing. |
| DEGUZMAN: | But there has to be something in it for them, too. |
| CW-1: | Of course. |

| | |
|---|---|
| PINA: | They're business men |
| CW-1 | That's what- that's what we're talking about, right? |
| DEGUZMAN: | And, legally, but legally- |
| CW-1 | But listen to me quick… |
| PINA: | What the hell are we here for? |
| UCE: | (laughs) |
| DEGUZMAN: | Right, but at the same time… |
| PINA: | See Mervina? That's the part where I'm like…you gotta get to the point if you know…we're not here to talk about the weather, we're here like okay, who are we gonna get on board? |
| DEGUZMAN: | Right. |
| PINA | You know, the numbers right? |

20. During the same meeting, PINA and DEGUZMAN asked CW-1 and UCE how the kickback payments should be structured for the physicians. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| DEGUZMAN: | And then what do they get? |
| CW-1: | I'm sorry? |
| DEGUZMAN: | What do the doctors get? |
| CW-1: | It depends. They all have their own- |
| DEGUZMAN: | How do they want it set up? |
| PINA: | Every doctor has their preference. |
| CW-1: | They all- they all have their individual ways. |
| DEGUZMAN: | What- what is the most popular setup? |
| CW-1: | Envelopes. Cash. Cause they don't want- they don't wanna be, uh, flagged, but- if it's checks, we can do that way- |

21. DEGUZMAN explained she brought PINA to their meeting to help negotiate the terms of the arrangement with CW-1 and UCE. PINA also offered to assist with the payment of kickbacks when needed. Below is an excerpt of the aforementioned exchange:

7

| | |
|---|---|
| UCE: | So, what would you…what would you guys. |
| CW-1: | How can we work? |
| DEGUZMAN: | That's why I brought her. |
| UCE: | Ok. |
| PINA: | She doesn't like to negotiate and at the end of the day you have to make sure (iu). |
| CW-1: | We know that. |
| UCE: | Not to be mean but I offered her like 10 choices at dinner and she walked away with none of them. |
| DEGUZMAN: | [CW-1] knows…because ah, and yet…she knows it she's like… |
| PINA: | Yeah cause I told her, cause you know I understand she has family like I think one of the things for her too, is like "what if I get busy and I need to be with my children?" I said like well yeah, that's why I'm here and you say "Rebecca I need you to go follow up with so and so, Rebecca I'm like you know…" It's a team effort. Or if I'm not around, you need to, you know…call the contact… |

22.  PINA then discussed with CW-1 and UCE how much she has paid in kickbacks for hospice patients. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| PINA: | Four hundred, four fifty. |
| UCE: | We can do that. |
| DEGUZMAN: | But the, but the home health, because the hospice, they want more. |
| PINA: | They want more. |
| CW-1: | What's the- what's the hospice? |
| PINA: | I've paid eight hundred to a thousand. The thousand, though, is for people that were like known, they're known to the hospital, right? They're in the hospital. |

23.  DEGUZMAN went on to explain how co-conspirators expected a maintenance fee for hospice patients who lived past the first billing cycle. DEGUZMAN reasoned the hospice companies

8

profited more from patients who remained on service, as the company could continue to bill for the care. By paying a maintenance fee, the individual making the referral also benefits financially. DEGUZMAN indicated she believed this to be a fair way of handling kickback arrangements for hospice patients. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| DEGUZMAN: | Well, that's what why they [hospitalists] got smart now. So, what they do is, you know, cause the next billing cycle, if the patient's still alive, we'll give you a thousand for the initial, and if the patient is still on service (UI) there is no recurring. If that patient doesn't make it for the second round, you don't get anything. |
| PINA: … | Even if they go all the way for 6 months. |
| DEGUZMAN: | …we should have a maintenance fee for those type patients because they're still in house, they're in our building, they're billing, so it's a maintenance fee. |

## B. PINA ACCEPTS KICKBACK PAYMENTS FOR THE REFERRAL OF CO-CONSPIRATORS WILLING TO PARTICIPATE IN THE KICKBACK SCHEME

24.     On October 18, 2017, UCE met with PINA to further discuss the terms of their arrangement. During their meeting PINA explained how she wanted to ensure patients she referred to the company were being billed for a minimum of six visits. In doing so, the company would receive the maximum reimbursement amount from Medicare, stating "I yeah know, obviously I wanna maximize every patient that I bring in to you guys. I wanna make sure that they're getting the six visits, right, and that were billing, not one visit and then, umm, we all lose money." PINA requested she be contacted if a patient received less than the six visits so she could then contact the patient in an effort to convince the patient to receive additional services. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| PINA: | Like I would wanna be notified if the patient is only gonna have three visits. Right? Like notify me so that I can see my, my, what I made on them, the patient. If they're… |
| UCE: | Sure. |

9

| | |
|---|---|
| PINA: | They're not gonna be like ok, well maybe do I need to call the patient and convince them to do one more visit or do I need to figure out why, sometimes they'll go I'm fine, then I'll go well, the doctor really wants you do one more visit. Right? Like I'm great at convincing. |

25. During the same meeting, PINA and UCE discussed paying PINA $500 a month to entertain and recruit potential co-conspirators into the scheme. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | So lets just say uhh, umm, no recpeits needed, $500 a month in entertainment expenses, done. |
| PINA: | Ok, so, you don't even need the receipts, cause I can give you the receipts. Ok. |

26. At the end of the meeting, PINA accepted $500 in cash from UCE. PINA again offered to provide receipts to UCE for expenses incurred while recruiting co-conspirators into the scheme. UCE re-iterated the importance of avoiding a paper trail because of the illicit nature with these co-conspirators. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | Five hundred, there you go. |
| PINA: | Ok, cool |
| UCE: | Monthly, expenses. |
| PINA: | And yea, then I don't umm, ok. |
| UCE: | No receipts. |
| PINA: | I can send the receipts to you. |
| UCE: | So here's the this is the unfortunate thing about it, is, uh, all these payments in cash to doctors, normally they'd all be tax deductible if we put people on payroll, and things like that, but we cant. |
| PINA: | Right. |
| UCE: | And I, and I just don't want. I don't want to suddenly have… |

    PINA:    The paper trail.

### C. DEGUZMAN INTRODUCES CW-1 AND UCE TO CO-CONSPIRATORS

27. Per their agreement, DEGUZMAN later introduced CW-1 and UCE to NGUYEN and ZHANG. CW-1 and UCE met with both physicians individually and DEGUZMAN was present for each meeting. During these meetings and in the presence of DEGUZMAN, CW-1 and UCE negotiated the terms of the kickback scheme and paid each physician $1,000 cash to begin the arrangement.

28. During the course of the UCO, NGUYEN referred over 40 patients to HHA Alpha, including at least ten Medicare patients. NGUYEN met regularly with UCE and CW-1 and accepted a total of $20,000 in kickback payments in exchange for patient referrals.

29. During the course of the UCO, ZHANG met with UCE on at least four occasions and referred one Medicare patient to HHA Alpha in exchange for $400 cash and accepted an additional $2,000 from UCE in exchange for ZHANG's agreement to send additional patient referrals to HHA Alpha at a later date.

## III. PROBABLE CAUSE FOR THE VIOLATION

### A. TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(2)(A), THE ANTI-KICKBACK STATUTE

30. Title 42 United States Code, Section 1320a-7b(b)(2)(A), in relevant part, makes it a crime to knowingly and willfully offer any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

31. PINA indirectly facilitated UCE's kickback payments to NGUYEN and ZHANG in order to induce NGUYEN and ZHANG to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

32. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by NGUYEN and ZHANG for home health and/or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(2)(A).

33. Therefore, there is probable cause to believe that PINA's indirect facilitation of UCE's kickback payments to NGUYEN and ZHANG to induce NGUYEN and ZHANG to send patient referrals to HHA Alpha, meets the definition of a kickback payment and violates anti-kickback statute.

### IV. CONCLUSION

34. Based on the foregoing, there is probable cause to believe PINA indirectly facilitated the payment of kickbacks to co-conspirators in exchange for patient referrals in violation of 42 United States Code, Section 1320a-7b(b)(2)(A).

### V. REQUEST FOR SEALING

35. Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect. Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 3rd day of September, 2019.

HON. JOSEPH C. SPERO
United States Chief Magistrate Judge